**AHDOOT & WOLFSON, P.C.**
Tina Wolfson (SBN 174806)
twolfson@ahdootwolfson.com
Robert Ahdoot (SBN 172098)
rahdoot@ahdootwolfson.com
Keith Custis (SBN 218818)
KCustis@ahdootwolfson.com
Theodore W. Maya (SBN 223242)
tmaya@ahdootwolfson.com
Bradley K. King
bking@ahdootwolfson.com
1016 Palm Avenue
West Hollywood, CA  90069
Telephone: (310) 474-9111
Facsimile: (310) 474-8585

**RIDOUT LYON + OTTOSON, LLP**
Christopher P. Ridout (SBN 143931)
c.ridout@rlollp.com
Caleb Marker (SBN 269721)
c.marker@rlollp.com
555 Ocean Boulevard, Suite 500
Long Beach, CA 90802
Telephone: (562) 216-7380
Facsimile: (562) 216-7385

**FINKELSTEIN, BLANKINSHIP, FREI-PEARSON & GARBER, LLP**
Todd S. Garber (Pro Hac Vice Forthcoming)
tgarber@FBFGLaw.com
1311 Mamaroneck Avenue
White Plains, New York 10605
Facsimile: (914) 517-5023
Facsimile: (914) 517-5055

Counsel for Plaintiff
  SANDRA BURGA

Counsel for Plaintiff
  ALISON CONFORTI

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SANDRA BURGA and ALISON CONFORTI, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>THE HAIN CELESTIAL GROUP, INC., a Delaware Corporation,<br><br>Defendant. | CASE NO. _____<br><br>**CLASS ACTION COMPLAINT**<br><br>JURY TRIAL DEMANDED |

Plaintiffs Sandra Burga ("Burga") and Alison Conforti ("Conforti") (collectively, "Plaintiffs"), by and through their counsel, bring this Class Action Complaint against The Hain Celestial Group, Inc. ("Defendant") on behalf of themselves and all others similarly situated, and allege, upon personal knowledge as to their own actions and their counsel's investigations, and upon information and belief as to all other matters, as follows:

## NATURE OF THE CASE

1.      This is a consumer protection and false advertising class action.  Defendant markets, advertises, and distributes various teas under the Celestial Seasonings brand name, which it prominently advertises as "100% Natural."

2.      The teas that Defendant advertises as 100% Natural include: [1]

- The following teas, which this Complaint refers to, collectively, as the "Genetically-Modified, Synthetic Teas":[2]

  - Antioxidant Green Tea*;
  - Antioxidant Max Green Tea Blackberry Pomegranate*;
  - Antioxidant Max Green Tea Blood Orange Star Fruit*;
  - Antioxidant Max Green Tea Dragon Fruit Melon*;
  - Antioxidant: Superfruit;
  - Authentic Green Tea;
  - Black Cherry Berry Herbal Tea;
  - Cinnamon Apple Spice Herbal Tea;
  - Country Peach Passion Herbal Tea;
  - Cranberry Apple Zinger Herbal Tea;
  - Decaf Green Tea;
  - Decaf Mandarin Orchard Green Tea*;
  - Decaf Mint Green Tea*;

---

[1] Defendant may discontinue offering some products and regularly introduces new products that are also falsely and misleadingly labeled "100% Natural." Defendant may also market and sell additional substantially similar products of which Plaintiffs are unaware. Plaintiffs will ascertain the identity of these additional products through discovery.

[2] Each of the Genetically-Modified, Synthetic Teas contains ascorbic acid that is synthetically manufactured from genetically modified corn and/or synthetically manufactured, hexane-processed soy lecithin, neither of which ingredient is "natural."  The teas marked with an asterisk "*" contain both ascorbic acid and soy lecithin.

- o Decaf Sweet Coconut Thai Chai Tea;
- o Fast Lane Caffeinated Black Tea;
- o Gingerbread Spice;
- o Half and Half Cool Brew Iced Tea;
- o Honey Lemon Ginseng Green Tea*;
- o Honey Vanilla Chamomile Herbal Tea;
- o Honey Vanilla White Tea Chai Tea;
- o Jammin' Lemon Ginger Herbal Tea;
- o LaxaTea Wellness Tea;
- o Lemon Zinger Herbal Tea;
- o Mandarin Orange Spice Herbal Tea;
- o Metabo Balance Wellness Tea;
- o Peach Blossom Green Tea*;
- o Pomegranate Green Tea;
- o Raspberry Gardens Green Tea*;
- o Safari Spice Rooibos Tea;
- o Sleepytime Decaf Blackberry Pomegranate Green Tea*;
- o Sleepytime Decaf Lemon Jasmine Green Tea*;
- o Sleepytime Echinacea Complete Care Wellness Tea;
- o Sleepytime Kids Goodnight Grape Herbal Tea*;
- o Sleepytime Peach Herbal Tea;
- o Sleepytime Sinus Soother Wellness Tea;
- o Sleepytime Throat Tamer Wellness Tea;
- o Sweet Acaí Mango Zinger Ice Herbal Tea;
- o Sweet Apple Chamomile Herbal Tea;
- o Sweet Harvest Pumpkin;
- o Sweet Raspberry Zinger Ice Herbal Tea;
- o Sweet Tangerine Orange Zinger Ice Herbal Tea;
- o Sweet Wild Berry Zinger Ice Herbal Tea;
- o Tangerine Orange Zinger Herbal Tea;
- o Tension Tamer Herbal Tea;
- o True Blueberry Herbal Tea;
- o Tummy Mint Wellness Tea; and
- o Wild Berry Zinger Herbal Tea.

- ▪ The following teas, which this Complaint refers to, collectively, as the "Artificially-Sweetened Teas":

- o Antioxidant Green Tea;
- o Antioxidant Max Green Tea Blackberry Pomegranate;
- o Antioxidant Max Green Tea Blood Orange Star Fruit;
- o Antioxidant Max Green Tea Dragon Fruit Melon;

- o Berry Kombucha Energy Shot;
- o Citrus Kombucha Energy Shot;
- o Cranberry Vanilla Wonderland;
- o ENERJI Berry Green Tea Energy Shot;
- o ENERJI Pomegranate Xtreme Green Tea Energy Shot;
- o Half and Half Cool Brew Iced Tea;
- o Laxatea Wellness Tea;
- o Metabo Balance Wellness Tea;
- o Pomegranate Xtreme Kombucha Energy Shot;
- o Sleepytime Kids Goodnight Grape Herbal Tea;
- o Sweet Acaí Mango Zinger Ice Herbal Tea;
- o Sweet Harvest Pumpkin;
- o Sweet Raspberry Zinger Ice Herbal Tea;
- o Sweet Tangerine Orange Zinger Ice Herbal Tea; and
- o Sweet Wild Berry Zinger Ice Herbal Tea.

- ▪ The following teas, which this Complaint refers to, collectively, as the "Contaminated Teas":

  - o Antioxidant Max Green Tea Blackberry Pomegranate;
  - o Antioxidant Max Green Tea Blood Orange Star Fruit;
  - o Antioxidant Max Green Tea Dragon Fruit Melon;
  - o Authentic Green Tea;
  - o English Breakfast Black KCup;
  - o Honey Lemon Ginseng Green Tea;
  - o Peach Blossom Green Tea;
  - o Raspberry Gardens Green Tea;
  - o Sleepytime Herbal Tea; and
  - o Sleepytime Kids Goodnight Grape Herbal Tea.

This Complaint refers to the Genetically-Modified, Synthetic Teas, the Artificially-Sweetened Teas and the Contaminated Teas collectively as the "Products."

3.     The Genetically-Modified, Synthetic Teas are not "100% Natural" for two independent reasons.   First, the Genetically-Modified, Synthetic Teas contain ingredients – ascorbic acid and/or soy lecithin – that are sourced from genetically-modified crops.[3]   A genetically modified ("GM") crop is a crop whose genetic

---

[3] While Defendant began to claim in late 2013 that it only used soy from non-GMO sources, Defendant has not made that claim throughout the putative class period. Upon information and belief,

material has been altered by humans using genetic engineering techniques.  The World Health Organization defines genetically modified organisms ("GMOs"), which include GM crops, as "organisms in which the genetic material (DNA) has been altered in a way that does not occur naturally."  GM crops are not natural, but man-made.  There are wide-ranging controversies related to GM crops, including health risks from ingesting GM foods and negative environmental effects associated with growing GM crops.  The use and labeling of GM foods is the subject of a variety of laws, regulations, and protocols worldwide.

4.     Second, in addition to the fact that Defendant's ascorbic acid and soy lecithin are derived from GM crops, Defendant's 100% Natural claim on the packaging of the Genetically-Modified, Synthetic Teas is false because Defendant's ascorbic acid and soy lecithin are synthetic, highly-processed additives, and not 100% natural ingredients.

5.     Upon information and belief, Defendant uses hexane-processed soy lecithin in the Genetically-Modified, Synthetic Teas. Hexane is a constituent of gasoline obtained from crude oil, natural gas liquids, or petroleum refinery processing. 40 C.F.R. § 99.2155. According to the United States Occupational Safety and Health Administration ("OSHA"), hexane is a narcotic and neurotoxic agent, which can cause irritation to the eyes and upper respiratory tract. Commercial hexane also contains benzene, a known hematologic poison linked to chronic leukemia. Although Defendant discloses soy lecithin on the list of ingredients on its Genetically-Modified, Synthetic Teas, Defendant fails to disclose that it uses hexane-processed soy lecithin.

6.     The Artificially-Sweetened Teas are not 100% Natural because each contains an unnatural, non-caloric sweetener described as either "Rebiana (Sweetener from Stevia)," "Rebiana (sweetener from stevia, contains soy lecithin)" or "Stevia extract (sweetener)."  Rebiana – also known as Rebaudioside A or "Reb A"or, simply,

_____

and given that over 93% of all soy beans grown domestically in the United States in 2011, 2012 and 2013 are GM, Defendant used GM soybeans as a source for its soy lecithin.

CLASS ACTION COMPLAINT
- 5 -

"Stevia extract" – is a highly chemically processed steviol glycoside, a purified form of stevia leaf extract that is 200-300 times more potent than sugar. The FDA has determined that Reb A "is not stevia."[4]

7.   Reb A is also not "100% natural."  Reb A is manufactured through a patented 42-step chemical process that includes washing crude stevia extract with ethanol, methanol, or rubbing alcohol, and may include adding chloroform or hexane to dried plant leaves. Flocculants such as calcium hydroxide and aluminum sulfate may be used to facilitate the removal-of undesired accompanying substances.  The Reb A is then demineralized and decolorized with ion exchangers and spray dried. The crystals are then separated with centrifugation, micro-filtered and spray dried. At times, concentrated solutions of hydrochloric acid and sodium hydroxide are used to regenerate ion exchange resins. Thus, Reb A is not "100% natural."

8.   The Contaminated Teas are not natural.   To the contrary, the Contaminated Teas contain pesticides, herbicides, insecticides, carcinogens, and/or developmental toxins (collectively, "Contaminants").  Many of the Contaminated Teas contain Contaminants in levels violating federal standards included in 40 C.F.R. § 180, and some contain Contaminants included in the current Proposition 65 list, for which no safe harbor limits have been established.  In short, the Contaminated Teas contain potentially dangerous Contaminants and are most definitely not "100% Natural."

9.   Although the Products are not "100% Natural," Defendant prominently labels every box of the Products sold in the United States as "100% Natural." Defendant does this because consumers perceive all natural foods as better, healthier, and more wholesome.  In fact, the market for all natural foods has grown rapidly in recent years, a trend that Defendant exploits through its false advertising.

10.   Defendant is fully aware that natural products appeal to consumers. In its 2012 Corporate Social Responsibility Report, Defendant proclaims that it does "not use

---

[4] *See* http://www.fda.gov/AboutFDA/Transparency/Basics/ucm214865.htm (last visited Jan. 15, 2015).

GMOs, artificial and synthetic additives, non-nutrititive sweeteners, or artificial colors, preservatives or flavors in our organic and natural products." These claims, like the "100% Natural" claim, are false. Ascorbic acid is a synthetic additive. Upon information and belief, the ascorbic acid used in Defendant's products is manufactured from GM corn in China. Rebiana has zero calories and is, thus, a "non-nutrititive sweetener."

11. Any consumer who purchased the Products – irrespective of their motivation for purchasing the Products – suffered harm in the form of a higher price that Defendant was able to command for the Products based on the false representations that they are "100% Natural."

12. Plaintiffs bring claims against Defendant individually and on behalf of classes of all other similarly situated purchasers of the Products for: (1) breach of express warranties; (2) violations of California's Consumers Legal Remedies Act, Cal. Civ. Code § 1750, *et seq*.; (3) violations of California's False Advertising Law, Cal. Bus. & Prof. Code § 17500, *et seq*.; (4) violations of California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq*.; (5) violations of New York General Business Law § 349; (6) violations of New York General Business Law § 350; and (7) violations of the Consumer Protection Acts of the States of Florida, Fla. Stat. §501.201, *et seq*.; Illinois, 815 Ill. Comp. Stat. 502/1, *et seq*.; Massachusetts, Mass. Gen. Laws Ch. 93A, *et seq*.; Michigan, Mich. Comp. Laws §445.901, *et seq*.; Minnesota, Minn. Stat. §325F.67, *et seq*.; Missouri, Mo. Rev. Stat. 010, *et seq*.; New Jersey, N.J. Stat. §56:8-1, *et seq*.; and Washington, Wash. Rev. Code §19.86.010, *et seq*.

13. Plaintiffs seek an order requiring Defendant to, among other things: (1) cease the unlawful marketing; (2) conduct a corrective advertising campaign; and (3) pay damages and restitution to Plaintiffs and Class members in the amounts paid to purchase the products at issue.

## JURISDICTION AND VENUE

14. This Court has subject matter jurisdiction over this action under the Class

Action Fairness Act, 28 U.S.C. § 1332(d).  The aggregated claims of the individual class members exceed $5,000,000, exclusive of interest and costs, and this is a class action in which more than two-thirds of the proposed plaintiff class, on the one hand, and Defendant, on the other, are citizens of different states.

15.    This Court has personal jurisdiction over Defendant because it conducts business in California and otherwise intentionally avails itself of the markets in California to render the exercise of jurisdiction by this Court proper. Defendant has marketed, promoted, distributed, and sold the Products in California.

16.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the alleged claims occurred in this District given that Plaintiff Burga resides in this District and Defendant markets, promotes, distributes and sells the Products in this District.

**PARTIES**

17.    Plaintiff Burga is a resident of Orange County, California.

18.    Plaintiff Conforti is a resident of Brooklyn, Kings County, New York.

19.    Defendant The Hain Celestial Group, Inc. is a Delaware corporation with its principal place of business located in Lake Success, New York. Upon information and belief, Defendant's Celestial Seasonings division is located in Boulder, Colorado. Defendant manufactures, promotes, markets and distributes the Products to consumers in California, New York and throughout the United States.

**SUBSTANTIVE ALLEGATIONS**

**A.    Defendant Deceptively Labels The Products As "100% Natural"**

20.    For the four years preceding the filing of this Complaint, Defendant has prominently and conspicuously labeled and advertised the Products as "100% Natural."  The labeling and marketing on the Products communicates a straightforward, material message, which is that the "100% Natural" Products are 100% natural.

21.    The core deceptive, false, and misleading representations that the

1  Products are "100% Natural" is conspicuously and prominently placed on the
2  Products' packaging for every person to see as soon as they pick up the Products to
3  read it.  By way of illustration, the "100% Natural" representations appear on the
4  Products' packaging like this:



16      22.    By conspicuously and prominently placing the "100% Natural"
17  representations on the Products' packaging, Defendant has ensured that all consumers
18  purchasing the Products are exposed to its "100% Natural" claims.

19  **B.   The Genetically-Modified, Synthetic Teas**

20  **1.   Ingredients Derived From Genetically Modified Organisms Are Not 100%
       Natural**

22      23.    Genetically modified crops do not occur in nature, and as such are not
23  "100% Natural."   On the contrary, genetically modified crops are crops that are
    genetically manipulated from their natural state.  For example, Monsanto, one of the
24  largest producers of genetically modified crop seed, defines genetic modification (or
25  genetic engineering) to mean "[t]he technique of removing, modifying or adding genes
26  to a living organism via genetic engineering or other more traditional methods.  Also
27  referred to as gene splicing, recombinant DNA (rDNA) technology or genetic
28  engineering."   Monsanto also defines Genetically Modified Organisms ("GMO") as

"[p]lants or animals that have had their genetic makeup altered to exhibit traits that are not naturally theirs.  In general, genes are taken (copied) from one organism that shows a desired trait and transferred into the genetic code of another organism."[5]

24.    The World Health Organization's ("WHO") definition of GMO is consistent with Monsanto's definition:  "Genetically modified (GM) foods are foods derived from organisms whose genetic material (DNA) has been modified in a way that does not occur naturally, e.g. through the introduction of a gene from a different organism."[6]  WHO also cautions that "All GM foods should be assessed before being allowed on the market."[7]

25.    The United States Environmental Protection Agency ("EPA") for Prevention, Pesticides, And Toxic Substances, has distinguished between conventional breeding of plants "through natural methods, such as cross-pollination" and genetic engineering.  "Conventional breeding is a method in which genes for pesticidal traits are introduced into a plant through natural methods, such as cross-pollination." "Genetically engineered plant-incorporated protectants are created through a process that utilizes several different modern scientific techniques to introduce a specific pesticide-producing gene into a plant's DNA genetic material."[8]

26.    Romer Labs, a company that provides diagnostic services to the agricultural industry, including tests to detect and determine the existence of GM crops, defines GM crops as "[a]griculturally important plants [that] are often genetically modified by the insertion of DNA material from outside the organism into the plant's DNA sequence, allowing the plant to express novel traits that normally would not appear in nature, such as herbicide or insect resistance. Seed harvested from GMO

---

[5] *See id.*

[6] *See* http://www.who.int/topics/food_genetically_modified/en/ (last visited  Jan. 15, 2015).

[7] *Id.*

[8] *See* EPA Questions & Answers, Biotechnology: Final Plant-Pesticide/Plant Incorporated Protectants (PIPs) Rules, dated July 19, 2001 at http://www.epa.gov/scipoly/ biotech/pubs/qanda.pdf (last visited Jan. 15, 2015).

plants will also contain these modifications."[9]

27.    As indicated by the various industry, government and health protection agency organizations cited above, GM crops and GMOs are not "100% natural."  In addition, ingredients made from GM crops and GMOs are not "100% natural."

28.    The United States Department of Agriculture ("U.S.D.A") estimates that, as of 2014, approximately 94% of soybeans grown in the United States is genetically modified.[10]

29.    The market for natural products is large and ever growing and consumers are willing to pay a premium for products they believe to be natural, healthy and/or organic.  Natural Foods Merchandiser magazine's 2013 Market Overview reported significant growth for the natural and organic products industry.  Gleaning more than $89.4 billion dollars in revenue in 2013 alone, the industry grew ten-and-a-half percent (10.5%) from 2012, revealing that consumers' desire for natural products is huge and continues to grow.

## 2.    The Products Are Not 100% Natural Because They Contain Ingredients That Are Sourced From GM Crops

30.    Defendant's "100% Natural" representations are deceptive, false, misleading, and unfair to consumers who are injured in fact by purchasing Products that Defendant claims are "100% Natural" when the Products actually contain ingredients made from GM corn and soybeans and, thus, are not all natural.

31.    Specifically, although labeled "100% Natural," each variety of the Genetically-Modified, Synthetic Teas contains either ascorbic acid or soy lecithin.

32.    Upon information and belief, the corn used to manufacture the ascorbic

---

[9] *See* http://www.romerlabs.com/en/knowledge/gmo/ (last visited  Jan. 15, 2015).

[10] *See* http://www.ers.usda.gov/media/185551/biotechcrops_d.html (last visited Jan. 15, 2015)*; see also* http://www.huffingtonpost.com/margie-kelly/genetically-modified-food_b_2039455.html  (last visited  Jan. 15, 2014); *see also* Economic Research Service, USDA, Genetically engineered varieties of corn, upland cotton, and soybeans, by State and for the United States, 2000-14 (alltables.xls), available  at  http://www.ers.usda.gov/data-products/adoption-of-genetically-engineered-crops-in-the-us.aspx#.VBcWqC5dWyR (last visited  Jan. 15, 2015).

acid used by Defendant as an ingredient in the Genetically-Modified, Synthetic Teas is produced using GM corn.

33.     Upon information and belief, the soy lecithin used as an ingredient in the Genetically-Modified, Synthetic Teas has been produced from GM soybeans during four-year period preceding the filing of this Complaint.

**3.     The Products Are Not 100% Natural Because They Contain Artificial, Synthetic Ingredients**

34.     Independent of the use of GM crops in the Products, Defendant's "100% Natural" claims are false because the Products contain ingredients that are synthetic and so heavily processed that they no longer are chemically the same as the raw ingredients.

35.     Ascorbic acid is a synthetic, chemically modified form of Vitamin C used in foods as an antioxidant and as a preservative, and is recognized as being "synthetic" by federal regulation. 7 C.F.R. § 205.605(b). Ascorbic acid is generally produced from genetically modified corn before being converted to glucose, then to sorbitol and then to ascorbic acid through a series of chemical processes and purification steps.  The various processes by which ascorbic acid is synthesized renders the ascorbic acid chemically derived and unnatural.

36.     Soy lecithin is used in food as an emulsifier, lubricant, and preservative. Soy Lecithin is extracted from soybeans by immersing them in hexane, a byproduct of petroleum refining, before further processing. Soy lecithin's chemical manufacturing process places it outside of reasonable consumer's definition and understanding of "100% Natural."

**4.     The Artificially-Sweetened Teas**

37.     Defendant's "100% Natural" claims are false because the Reb A in the Artificially-Sweetened Teas is so heavily processed that it no longer is chemically the same as raw stevia. Indeed, the FDA has determined that Reb A "is not stevia."

38.     The various processes by which stevia is converted to Reb A renders the

Reb A in the Artificially-Sweetened Teas chemically-derived and non-natural. Reb A no longer bears any natural chemical resemblance to the source crops from which it is derived as a result of the extensive process by which they are refined.

39.     Stevia typically refers to the crude stevia preparation (powder or liquid), which is obtained through the natural process of drying and crushing stevia leaves and then extracting them with hot water.   This natural crude stevia extract can be purchased as a supplement in health food stores.

40.     Reb A is a highly purified form of stevia extract, which (as discussed below) is obtained through a harsh and unnatural chemical purification process. Thus, while the highly processed, high purity Reb A in the Artificially-Sweetened Teas is derived from the stevia plant, it is not the same as the natural stevia that is sold in the U.S. as a dietary supplement. This distinction is material to consumers, including Plaintiffs and Class members, who are seeking to consume natural products.

41.     Reb A is created by first extracting the crude stevia from the stevia leaf. The stevia leaves are dried, crushed, and extracted with water, followed by precipitation and filtration of the stevia extract.

42.     Some processes remove the "grease" from the leaves before extraction with solvents such as chloroform or hexane, a carcinogenic chemical linked to cancer and other major health problems in studies conducted on animals.

43.     The steviol glycosides (which are the sweet components of the stevia leaf extract) are dissolved in the primary extract while residual plant components are suspended in the primary extract. Unwanted plant components are removed by "flocculation." Flocculation is the process of "flaking" the suspended solids out of the primary extract while leaving behind what is dissolved in solution. This process results in crude stevia extract.

44.     The crude stevia extract is then processed to concentrate the steviol gylcosides. In this process, an adsorption resin is used to trap the steviol glycosides of the leaf extract.   The resin is washed with methanol or ethanol to release the

glycosides. The extract is then concentrated by evaporation or with an adsorption resin, followed by drying to yield a steviol glycoside primary extract. The dried extract may be stored and transported in this form before final purification.

45.     The stevia concentrate is then purified selectively for Reb A by stripping away all the steviol glycosides except the Reb A through a multi-step patented process.  In the purification process, the primary extract is re-dissolved in a water-alcohol solvent mixture and further processed by filtration, crystallization, and centrifugation steps. The resulting preparation of crystals is rinsed with ethanol and vacuum-dried to yield the final purified Reb A product.  This purification process results in a high purity (97%) mixture of Reb A and polymorphs of Reb A.

46.     That Reb A is obtained through a harsh chemical process is material to consumers, including Plaintiffs and members of the Class, who are seeking to consume natural products. Consumers, including Plaintiffs and members of the Class, do not consider a product with an ingredient that is harshly chemically processed to be natural.

47.     Moreover, the U.S. Department of Agriculture ("USDA") takes into account the level of processing in its policy on natural claims on food labeling.  The USDA defines a product as "natural" when "(1) The product does not contain any artificial flavor or flavoring, coloring ingredient, or chemical preservative (as defined in 21 C.F.R. 101.22), or any other artificial or synthetic ingredient; and (2) the product and its ingredients are not more than minimally processed."  "Minimal processing may include those traditional processes used to make food edible or to preserve it or to make it safe for human consumption, e.g., smoking, roasting, freezing, drying, and fermenting."  "Relatively severe processes, e.g., solvent extraction, acid hydrolysis, and chemical bleaching would clearly be considered more than minimal processing."

48.     On information and belief, the ingredient in certain of the Artificially-Sweetened Teas described by Defendant as "Stevia extract (sweetener)" is Reb A.

49.     No reasonable consumer would know, or have reason to know, that Reb

A is manufactured through a harsh chemical process. This information is within the exclusive knowledge of Defendant and is not known to ordinary consumers, including Plaintiffs and members of the Class. Defendant actively conceals this material fact from consumers, including Plaintiffs and members of the Class.

50.    Moreover, in its 2012 Corporate Social Responsibility Report, Defendant falsely proclaims that Defendant does "not use GMOs, artificial and synthetic additives, non-nutritive sweeteners, or artificial colors, preservatives or flavors in our organic and natural products."   Rebiana has zero calories and is, thus, a "non-nutritive sweetener."

## C.    **The Contaminated Teas**

51.    The Contaminated Teas at issue are 10 types of tea.  Throughout the Class Period, Defendant has prominently labeled and otherwise advertised the Contaminated Teas as "100% Natural."

52.    As widely reported following publication of testing of the Contaminated Teas by Eurofins, a highly regarded, accredited, and independent testing lab (the "Eurofins Tests"), each of the Contaminated Teas has been found to contain significant levels of one or more of the following Contaminants, described on information and belief as follows:

a.    **Buprofezin.**   Buprofezin is a synthesized chemical insecticide developed by the Dow Chemical Company ("Dow") and marketed by Dow as "Applaud."   Due to safety concerns, the US government has set tolerances for residues of Buprofezin with regard to certain agricultural commodities, generally in the range of a fraction of a part per million, in 40 C.F.R. § 180.511. Buprofezin was found to have a variety of deleterious effects on rodents exposed to it in a variety of controlled studies, including increased incidences of lesions and tumors on rodents' livers, adverse liver and thyroid gland effects at relatively low doses, and adverse developmental and reproductive effects including decreased pup weight.   *See, e.g.,*   <http://pmep.cce.cornell.edu/profiles/insect-mite/

abamectin-bufencarb/buprofezin/applaud70_reg_0503.html> (last visited March 17, 2014).  Buprofezin is a man-made chemical, and is not naturally occurring or "natural" in any sense of the word.

        b.    **Carbendazim.**  As described by the U.S. Environmental Protection Agency ("EPA"), Carbendazim is "a fungicide approved for use in paints, adhesives, textiles, and ornamental trees.  It is not approved for use on foods in the U.S."  <http://www.epa.gov/pesticides/factsheets/chemicals/carbendazim-fs.htm> (last visited Oct. 4, 2013).  Thus, Carbendazim in food products is unlawful under the Federal Food, Drug, & Cosmetic Act, including under 21 U.S.C. § 346a.  *See also* 40 C.F.R. § 180.3 *et seq.* (omitting Carbendazim from pesticides approved for food in quantities deemed safe by the EPA).  Carbendazim is identified as a hazardous waste under federal regulations, including 40 CFR § 261.33.  Carbendazim is a man-made chemical, and is not naturally occurring or "natural" in any sense of the word.

        c.    **Chlorpyrifos-ethyl.**  Chlorpyrifos-ethyl, also known as Chlorpyrifos or its trade names Dursban, Lorsban, or Renoban, is a potent neurotoxin used as a pesticide.  Dow developed and introduced this unnatural chemical in or about 1965.  *See* <http://pmep.cce.cornell.edu/profiles/extoxnet/carbaryl-dicrotophos/chlorpyrifos-ext.html> (last visited Feb. 26, 2014).  Tolerances for residues of Chlorpyrifos-ethyl are set with regard to certain agricultural commodities in 40 C.F.R. § 180.342, which also mandates strict controls for application of this unnatural chemical.  Chlorpyrifos-ethyl has been the subject of much litigation, including an action by the New York Attorney General regarding Dow's marketing of Chlorpyrifos-ethyl as safe, which resulted in a $2 million payment by Dow to the state of New York.  Chlorpyrifos-ethyl is a man-made chemical, and is not naturally occurring or "natural" in any sense of the word.

        d.    **Chlorfenapyr.**  Chlorfenapyr is a synthesized chemical insecticide

and, due to safety concerns, the US government has set tolerances for residues of it on or in certain agricultural commodities, generally in the range of one part per million, in 40 C.F.R. § 180.513.  The EPA registered Chlorfenapyr for use in non-food crops in greenhouses in January 2001.  *See* <http://www. epa.gov/opp00001/chem_search/reg_actions/registration/fs_PC-129093_01-Jan-01.pdf> (last visited Feb. 26, 2014).  Chlorfenapyr is a man-made chemical, and is not naturally occurring or "natural" in any sense of the word.

e. **Cyhalothrin lambda.**  Cyhalothrin lambda, or Lambda-cyhalothrin, is a synthesized chemical insecticide and, due to safety concerns, the U.S. government has set tolerances for residues of it on or in certain agricultural commodities, generally in the range of one part per million, in 40 C.F.R. § 180.438.  Cyhalothrin lambda is a synthetic pyrethroid that disrupts the functioning of the nervous system in an organism, and may cause paralysis or death.  *See* <http://npic.orst.edu/factsheets/l_cyhalogen.pdf> (last visited Feb. 26, 2014).  Cyhalothrin lambda is a man-made chemical, and is not naturally occurring or "natural" in any sense of the word.

f. **Cypermethrin.**  Cypermethrin is a synthesized chemical insecticide and, due to safety concerns, the U.S. government has set tolerances for residues of it on or in certain agricultural commodities, generally in the range of one part per million, in 40 C.F.R. § 180.418.  Cypermethrin is found in many household insect killers and excessive exposure can cause nausea, headache, muscle weakness, salivation, shortness of breath and seizures.  Cypermethrin is a man-made chemical, and is not naturally occurring or "natural" in any sense of the word.

g. **p,p'-DDT.**  P,p'-DDT, or p,p'-Dichlorodiphenyltrichloroethane (DDT) (CASRN 50-29-3), is an isomer and the major component of commercial DDT, an unnatural chemical insecticide that has well-known and highly negative environmental impacts, including damage to many bird species (including the

Bald Eagle) that occurred when such animals accumulated the chemical in their bodies through diet.  DDT has been banned in US agriculture since 1972, and is classified as a "probable human carcinogen" by the EPA. <http://www.epa.gov/iris/subst/0147.htm> (last visited Oct. 4, 2013).  It also is classified as a chemical "known to the State [of California] to cause cancer or reproductive toxicity," and is included on California's Proposition 65 list. <http://oehha.ca.gov/prop65/prop65_list/files/P6509272013.pdf> (last visited Oct. 7, 2013).  The EPA has not set tolerances for DDT in food products and thus its presence is unlawful under the Federal Food, Drug, & Cosmetic Act, including under 21 U.S.C. § 346a.  *See also* 40 C.F.R. § 180.3 *et seq.* (omitting DDT from pesticides approved for food in quantities deemed safe by the EPA). P,p'-DDT is a man-made chemical, and is not naturally occurring or "natural" in any sense of the word.

h.  **Diazinon.**  Diazinon is a synthesized chemical insecticide, and tolerances for residues of it are set with regard to certain agricultural commodities in 40 C.F.R. § 180.153.  Diazinon is a man-made chemical, and is not naturally occurring or "natural" in any sense of the word.

i.  **Dimethachlor.**  Dimethachlor is a synthesized chemical pesticide. The EPA has not set tolerances for Dimethachlor in food products and thus its presence is unlawful under the Federal Food, Drug, & Cosmetic Act, including under 21 U.S.C. § 346a.  *See also* 40 C.F.R. § 180.3 *et seq.* (omitting Dimethachlor from pesticides approved for food in quantities deemed safe by the EPA); <http://ec.europa.eu/food/plant/protection/evaluation/existactive/dimethachlor.pdf> (containing European Union's report on Dimethachlor).  Diazinon is a man-made chemical, and is not naturally occurring or "natural" in any sense of the word.

j.  **Dimethoate.**  Dimethoate is a synthesized chemical insecticide, and tolerances for residues of it are set with regard to certain agricultural commodities in 40 C.F.R. § 180.204.  Dimethoate is a man-made chemical, and

is not naturally occurring or "natural" in any sense of the word.

k. **Endosulfan.** Endosulfan is a synthesized chemical insecticide, and is a chemical cousin of DDT that mimics the female hormone estrogen in the human body. Tolerances for residues of Endosulfan are set with regard to certain agricultural commodities in 40 C.F.R. § 180.182. In 2010, EPA announced its intent to terminate the use of Endosulfan domestically. *See* <http://www.epa.gov/pesticides/reregistration/endosulfan/endosulfan-cancl-fs.html> (last visited Feb. 26, 2014). Endosulfan is a man-made chemical, and is not naturally occurring or "natural" in any sense of the word.

l. **Fludioxonil.** Fludioxonil is a synthesized chemical insecticide and, due to safety concerns, the US government has set tolerances for residues of it on or in certain agricultural commodities in 40 C.F.R. § 180.516. Fludioxonil is a man-made chemical, and is not naturally occurring or "natural" in any sense of the word.

m. **Fipronil.** Fipronil is a synthesized chemical insecticide and, due to safety concerns, the US government has set tolerances for residues of it on or in certain agricultural commodities in 40 C.F.R. § 180.517. Fipronil is a man-made chemical, and is not naturally occurring or "natural" in any sense of the word.

n. **Hexaflumuron.** Hexaflumuron is a synthesized chemical pesticide owned, manufactured, and marketed by Dow, primarily for termite control. <http://msdssearch.dow.com/PublishedLiteratureDOWCOM/dh_0886/0901b803 80886a87.pdf?filepath=productsafety/pdfs/noreg/233-00932.pdf&fromPage= GetDoc> (last visited March 17, 2014). The EPA has not set tolerances for Hexaflumuron in food products and thus its presence is unlawful under the Federal Food, Drug, & Cosmetic Act, including under 21 U.S.C. § 346a. *See also* 40 C.F.R. § 180.3 *et seq.* (omitting Hexaflumuron from pesticides approved for food in quantities deemed safe by the EPA). Hexaflumuron is a man-made chemical, and is not naturally occurring or "natural" in any sense of the word.

o.   **Imidacloprid.**  Imidacloprid is a synthesized chemical insecticide and, due to safety concerns, the US government has set tolerances for residues of it on or in certain agricultural commodities in 40 C.F.R. § 180.472.  Imidacloprid is a man-made chemical, and is not naturally occurring or "natural" in any sense of the word.

p.   **Malathion.**  Malathion is a synthesized chemical insecticide and, due to safety concerns, the US government has set tolerances for residues of it on or in certain agricultural commodities in 40 C.F.R. § 180.111.  Malathion is a man-made chemical, and is not naturally occurring or "natural" in any sense of the word.

q.   **Profenofos.**  Profenofos is a synthesized chemical insecticide and, due to safety concerns, the US government has set tolerances for residues of it on or in certain agricultural commodities in 40 C.F.R. § 180.404.  Profenofos is a man-made chemical, and is not naturally occurring or "natural" in any sense of the word.

r.   **Permethrin.**  Permethrin is a synthesized chemical insecticide and, due to safety concerns, the US government has set tolerances for residues of it on or in certain agricultural commodities in 40 C.F.R. § 180.378.  Permethrin is a man-made chemical, and is not naturally occurring or "natural" in any sense of the word.

s.   **Pyridaben.**  Pyridaben is a synthesized chemical insecticide and, due to safety concerns, the US government has set tolerances for residues of it on or in certain agricultural commodities in 40 C.F.R. § 180.494.  Pyridaben is a man-made chemical, and is not naturally occurring or "natural" in any sense of the word.

t.   **Propachlor.**  Propachlor is a synthesized chemical herbicide and, due to safety concerns, the US government has set tolerances for residues of it on or in certain agricultural commodities in 40 C.F.R. § 180.211.  Propachlor is

classified as a chemical "known to the State [of California] to cause cancer or reproductive toxicity," and is included on California's Proposition 65 list. <http://oehha.ca.gov/prop65/prop65_list/files/P6509272013.pdf> (last visited Oct. 7, 2013). Propachlor is a man-made chemical, and is not naturally occurring or "natural" in any sense of the word.

u. **Propargite.** Propargite is a pesticide that causes severe irritation to human skin and eyes and is a considered a probable human carcinogen by EPA. *See* <http://www.epa.gov/oppsrrd1/reregistration/REDs/factsheets/propargite_fs.htm> (last visited Feb. 26, 2014). Propargite is classified as a chemical "known to the State [of California[ to cause cancer or reproductive toxicity," and is included on California's Proposition 65 list. <http://oehha.ca.gov/prop65/prop65_list/Newlist.html>. *See also* 40 C.F.R. § 180.259 (government mandated tolerances for Propargite residues). Propargite is a man-made chemical, and is not naturally occurring or "natural" in any sense of the word.

v. **Thiamethoxam.** Thiamethoxam is a synthesized chemical insecticide and, due to safety concerns, the US government has set tolerances for residues of it on or in certain agricultural commodities in 40 C.F.R. § 180.565. Thiamethoxam is a man-made chemical, and is not naturally occurring or "natural" in any sense of the word.

w. **Thiacloprid.** Thiacloprid is a synthesized chemical insecticide and, due to safety concerns, the US government has set tolerances for residues of it on or in certain commodities, generally in the hundredth-of-a-part-per-million, in 40 C.F.R. § 180.594. Thiacloprid is a man-made chemical, and is not naturally occurring or "natural" in any sense of the word.

x. **Triazophos.** Triazophos is a synthesized chemical pesticide, which has been found to cause cognitive dysfunction in controlled rat studies. <http://www.ncbi.nlm.nih.gov/pubmed/23949197> (last visited Oct. 7, 2013). The EPA has not set tolerances for Triazophos in food products and thus its

presence is unlawful under the Federal Food, Drug, & Cosmetic Act, including under 21 U.S.C. § 346a.  *See also* 40 C.F.R. § 180.3 *et seq.* (omitting Triazophos from pesticides approved for food in quantities deemed safe by the EPA). Triazophos is classified as a marine pollutant by federal regulations, including 40 CFR § 172.101, App. B.  Triazophos is a man-made chemical, and is not naturally occurring or "natural" in any sense of the word.

53.    The published Eurofins Tests[11] revealed that Contaminants were found in Defendant's Contaminated Teas as follows:

| Celestial Seasonings Tea Sample | Buprofezin | Carbendazim | Chlorpyrifos-ethyl | Chlorfenapyr | Cyhalothrin lambda | Cypermethrin | p,p'-DDT | Diazinon | Dimethachlor | Dimethoate | Endosulfan (Sum) | Fludioxonil | Fipronil | Hexaflumuron | Imidacloprid | Malathion | Profenofos | Permethrin | Pyridaben | Propachlor | Thiamethoxam | Thiacloprid | Triazophos | Detected U.S. Adulterants |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Eng Bkfst Black K-Cup | | | | | | * | * | | | * | | | | | * | | | | | | * | | | 5 |
| Authentic Green Tea | * | | * | * | | | | | | | * | | | * | * | | * | | | | | | | 8 |
| Green Tea Honey Lem Gin | * | | * | * | | | | | | | | | | * | * | | | * | | | | | | 7 |
| Green Tea Peach Blossom | * | | * | * | | | | | | | | * | * | * | | | | * | | | | * | | 9 |
| Green Tea Rasp Gardens | * | | * | * | | | | | | | | | | * | * | | | * | | | * | * | | 9 |
| Rooibos Safari Spice | | | | | | | | | | | | | | | | | | | | | | | | 0 |
| Sleepytime Herb Teas | | * | | | | | | * | * | | | | | | | * | * | | | | | | | 5 |
| Sleepytime Kids Gdnt Grape | * | * | | | | | | * | * | | | | | | | * | * | | * | | | | | 7 |
| Antioxidant Max Blckbry Pom | * | | * | * | | | | | | | | | * | | * | | | * | | | | | | 7 |
| Antioxidant Max Blood Orange | * | | * | * | | | | | | | | | | | * | | | * | | | | * | | 7 |
| Antioxidant Max Dragon Fruit | * | | * | * | | | | | | | | | | | * | | | * | | | * | * | | 8 |

* violation of U.S. 40 CFR 180; pesticide residue detected for which there is no established EPA tolerance level or for which such tolerance level was exceeded.

**Total** 72
**Average Violations per Sample** 6.5

54.    In response to publication of the Eurofins Tests, Defendant posted a "Safety Assurance" statement on its website assuring consumers that its teas are "safe" despite the adverse test results, and boasting that Defendant sent the same types of teas

[11]    *See*   https://glaucusresearch.com/wp   content/uploads/downloads/2013/02/   GlaucusResearch-The_Hain_Celestial_Group_Inc-NasdaqHAINStrong_Sell_Febuary_21_2013.pdf (last visited Jan. 15, 2015)

to a different laboratory, identified as the National Food Lab ("NFL"), for testing that "detected no **pesticides** in the **brewed** Celestial Seasonings teas they tested."[12] It is unclear why NFL tested **brewed** products when that is not the state in which consumers purchase Defendant's Contaminated Teas.

55.    Defendant has not disclosed the actual test results on which it relied to issue its Safety Assurance and, on information and belief, has claimed that the results constitute "proprietary information."[13]

56.    Furthermore, NFL proudly lists Celestial Seasonings as one of its clients on its website, stating, 'somewhere along the line, we have had a hand in their success.'"[14]

57.    Defendant's misleading "Safety Assurance," which does not directly deny the presence of pesticides, amounts to an admission by defendant that its teas contain unnatural, toxic pesticides, and thus are not "100% Natural," as advertised.

58.    In its Safety Assurance, Defendant also asserted that the Eurofins Tests were reported by a "short seller" that stood to profit if Defendant's stock price declined as a result of publication of the Eurofins Tests.  Defendant did not and could not, however, claim that Eurofins was biased or that the Eurofins Tests were not, in fact, accurate.

59.    Despite the presence of these Contaminants in its Contaminated Teas, and despite Defendant's clear knowledge of the Contaminants, Defendant continues to prominently label the Products as "100% Natural" just as it has at all relevant times before and after publication of the Eurofins Tests.

---

[12] *See* http://www.celestialseasonings.com/safety-assurance (emphasis added) (last visited Jan. 15, 2015).

[13] *See* http://www.examiner.com/article/dangerously-high-pesticide-levels-found-celestial-seasonings-teas (last visited Jan. 15, 2015).

[14] *Id.*; *see also* http://web.archive.org/web/20130501174523/http://www.thenfl.com/about-us/our-clients (showing archived version of NFL website listing Celestial Seasonings among clients and including quoted language) (last visited Jan. 15, 2015).

D.   **Defendant's False and Misleading Advertising is Likely to Deceive Reasonable Consumers**

60.    Defendant's false and misleading representations and omissions are likely to deceive Plaintiffs and other reasonable consumers.

61.    Reasonable consumers must and do rely on food label representations and information in making purchase decisions.

62.    Defendant's statement that the Products are "100% Natural" is material to a reasonable consumer's purchase decision because reasonable consumers, such as Plaintiffs, care whether food products contain unnatural, synthetic, artificial, and/or GM ingredients, especially when a product claims to be "100% Natural."

63.    Reasonable consumers attach importance to an "100% Natural" claim when making a purchasing decision.

64.    According to a June 2014 consumer survey conducted by Consumer Reports, more than 8 out of 10 consumers believe that packaged foods carrying the "natural" label should come from food that contains ingredients grown without pesticides (86%), do not include artificial ingredients (87%), and do not contain GM organisms (GMOs) (85%).[15]

65.    Defendant markets and advertises the Products as "100% Natural" to increase sales derived from the Products.  Defendant is well aware that claims of food being "100% Natural" are material to reasonable consumers.

66.    Upon information and belief, in making the false, misleading, and deceptive representations and omissions, Defendant knew and intended that consumers would pay a price premium for the Products if it were labeled "100% Natural."

E.   **Plaintiffs' Reliance and Damages**

67.    Plaintiff Burga has purchased several Products in California within the past four years in reliance on Defendant's representations that the Products were

---

[15] *See* http://finance.yahoo.com/news/consumer-reports-survey-majority-americans-100000330.html (last visited Jan. 14, 2015).

"100% Natural." Specifically, within the past four years, Plaintiff Burga purchased Products including Antioxidant Green Tea, Antioxidant Max Green Tea Blackberry Pomegranate and Antioxidant Max Green Tea Blood Orange Star Fruit at retailers in California, including, but not limited to, Albertsons.

68.     Prominently on each of the Products' labels appeared the words "100% Natural Teas."  This representation was material to Plaintiff Burga's decision to make these purchases.

69.     Plaintiff Burga was willing to pay for the Products because of the representations that they were "100% Natural" and would not have purchased the Products, would not have paid as much for the Products, or would have purchased alternative products in absence of the representations, or with the knowledge that the Products contained artificial, synthetic ingredients; ingredients sourced from GM crops, an artificial, highly-processed non-nutritive sweetener and/or the Contaminants.

70.     Ms. Burga paid for "100% Natural" Products, but she received Products that were not "100% Natural."

71.     The Products that Ms. Burga received were worth less than the products for which she paid. By purchasing products in reliance on advertising that is false, Ms. Burga has suffered injury in fact and lost money as a result of the unfair business practices alleged here.

72.     Plaintiff Conforti has purchased several Products in New York within the past four years in reliance on Defendant's representations that the Products were "100% Natural." Specifically, within the past four years, Plaintiff Conforti purchased Products including Antioxidant Green Tea and Sleepytime Herbal Tea at retailers in King County, including, but not limited to, the Associated Supermarkets.

73.     Prominently on each of the Products' labels appeared the words "100% Natural Teas."  This representation was material to Plaintiff Conforti's decision to make these purchases.

74.     Plaintiff Conforti was willing to pay for the Products because of the

representations that they were "100% Natural" and would not have purchased the Products, would not have paid as much for the Products, or would have purchased alternative products in absence of the representations, or with the knowledge that the Products contained artificial, synthetic ingredients; ingredients sourced from GM crops, an artificial, highly-processed non-nutritive sweetener and/or the Contaminants.

75.   Ms. Conforti paid for "100% Natural" Products, but she received Products that were not "100% Natural."

76.   The Products that Ms. Conforti received were worth less than the products for which she paid. By purchasing products in reliance on advertising that is false, Ms. Burga has suffered injury in fact and lost money as a result of the unfair business practices alleged here.

## CLASS ACTION ALLEGATIONS

77.   Plaintiffs seek relief in their individual capacities and as class representatives of all others who are similarly situated.   Pursuant to Fed. R. Civ. P. 23(a) and (b)(2) and/or (b)(3), Plaintiffs seek certification of the following Nationwide, Multi-State, California and New York classes.

78.   The Nationwide Classes are initially defined as follows:

> All persons residing in the United States who, from the date that is four years prior to the filing of this Complaint until the date notice is disseminated to the Class, purchased any of the Genetically-Modified, Synthetic Teas (the "Nationwide Genetically-Modified, Synthetic Teas Class").

> All persons residing in the United States who, from the date that is four years prior to the filing of this Complaint until the date notice is disseminated to the Class, purchased any of the Artificially-Sweetened Teas (the "Nationwide Artificially-Sweetened Teas Class").

> All persons residing in the United States who, from November 6, 2009 until the date notice is disseminated to the Class, purchased any of the Contaminated Teas (the "Nationwide Contaminated Teas Class").

79.   The <u>Multistate Classes</u> are initially defined as follows:[16]

All persons in the States of California, Florida, Illinois, Massachusetts, Michigan, Minnesota, Missouri, New Jersey, New York, and Washington who, from the date that is four years prior to the filing of this Complaint until the date notice is disseminated to the Class, purchased any of the Genetically-Modified, Synthetic Teas (the "<u>Multistate Genetically-Modified, Synthetic Teas Class</u>").

All persons in the States of California, Florida, Illinois, Massachusetts, Michigan, Minnesota, Missouri, New Jersey, New York, and Washington who, from the date that is four years prior to the filing of this Complaint until the date notice is disseminated to the Class, purchased any of the Genetically-Modified, Synthetic Teas (the "<u>Multistate Artificially-Sweetened Teas Class</u>").

All persons in the States of California, Florida, Illinois, Massachusetts, Michigan, Minnesota, Missouri, New Jersey, New York, and Washington who, from November 6, 2009 until the date notice is disseminated to the Class, purchased any of the Genetically-Modified, Synthetic Teas (the "<u>Multistate Contaminated Teas Class</u>").

80.   The <u>California Classes</u> are initially defined as follows:

All persons residing in the California who, from the date that is four years prior to the filing of this Complaint until the date notice is disseminated to the Class, purchased any of the Genetically-Modified, Synthetic Teas (the "<u>California Genetically-Modified, Synthetic Teas Class</u>").

All persons residing in the California who, from the date that is four years prior to the filing of this Complaint until the date notice is disseminated to the Class, purchased any of the Artificially-Sweetened Teas (the "<u>California Artificially-Sweetened Teas Class</u>").

All persons residing in the California who, from November 6, 2009 until the date notice is disseminated to the Class, purchased any of the Contaminated Teas (the "<u>California</u>

---

[16] The States in the Consumer Fraud Multi-State Class are limited to those States with similar consumer fraud laws under the facts of this case: California (Cal. Bus. & Prof. Code §17200, *et seq.*); Florida (Fla. Stat. §501.201, *et seq.*); Illinois  (815 Ill. Comp. Stat. 502/1, *et seq.*); (Massachusetts (Mass. Gen. Laws Ch. 93A, *et seq.*); Michigan (Mich.  Comp. Laws §445.901, *et seq.*); Minnesota (Minn. Stat. §325F.67, *et seq.*); Missouri (Mo. Rev. Stat.  010, *et seq.*); New Jersey (N.J. Stat. §56:8-1, *et seq.*); New York (N.Y. Gen. Bus. Law §349, *et seq.*); and Washington (Wash. Rev. Code §19.86.010, *et seq.*).

1  Contaminated Teas Class").

2  81.   The New York Classes are initially defined as follows:

3  All persons residing in the New York who, from the date that
   is four years prior to the filing of this Complaint until the date
4  notice is disseminated to the Class, purchased any of the
   Genetically-Modified, Synthetic Teas (the "New York
5  Genetically-Modified, Synthetic Teas Class").

6  All persons residing in the New York who, from the date that
7  is four years prior to the filing of this Complaint until the date,
   notice is disseminated to the Class purchased any of the
8  Artificially-Sweetened Teas (the "New York Artificially-
   Sweetened Teas Class").
9

10  All persons residing in the New York who, from November 6,
    2009 until the date notice is disseminated to the Class,
11  purchased any of the Contaminated Teas (the "New York
    Contaminated Teas Class").
12

13  82.   Excluded from each of the above Classes are Defendant, including any

14  entity in which Defendant has a controlling interest, is a parent or subsidiary, or which

15  is controlled by Defendant, as well as the officers, directors, affiliates, legal

16  representatives, predecessors, successors, and assigns of Defendant.  Also excluded

17  are the judges and court personnel in this case and any members of their immediate

18  families, as well as any person who purchased the Product for the purpose of resale.

19  83.   Plaintiff reserves the right to amend or modify the Class definitions with

20  greater specificity or division into subclasses after having had an opportunity to

21  conduct discovery.

22  84.   Numerosity.  Fed. R. Civ. P. 23(a)(1).  Each Class is so numerous that

23  joinder of all members is unfeasible and not practicable.  While the precise number of

24  Class members has not been determined at this time, Plaintiffs are informed and believe

25  that many thousands or millions of consumers have purchased the Products.

26  85.   Commonality.  Fed. R. Civ. P. 23(a)(2) and (b)(3).  There are questions of

27  law and fact common to each Class, which predominate over any questions affecting

28  only individual Class members.  These common questions of law and fact include,

---

CLASS ACTION COMPLAINT

without limitation:

         a.      Whether Defendant engaged in the conduct alleged herein;

         b.      Whether Defendant's practices were deceptive, unfair, improper and/or misleading;

         c.      Whether Defendant uniformly conveyed to the class that the Products were "100% Natural;"

         d.      Whether Defendant's claim that the Products are "100% Natural" is true or false or likely to deceive a reasonable consumer;

         e.      Whether Defendant violated California Civil Code §§ 1750, *et seq.*;

         f.      Whether Defendant violated California Business and Professions Code §§ 17200, *et seq.*;

         g.      Whether Defendant violated California Business and Professions Code §§ 17500, *et seq.*;

         h.      Whether Defendant violated New York General Business Law § 349;

         i.      Whether Defendant violated New York General Business Law § 350;

         j.      Whether Defendant breached an express warranty;

         k.      Whether Defendant violated California's Sherman Food, Drug, and Cosmetic Act, Cal. Health & Safety Code §§ 109875 *et seq.*;

         l.      Whether Defendant violated federal law including 21 U.S.C. § 346a and 40 C.F.R. §§ 180 *et seq.*; and

         m.      The nature of the relief, including equitable relief, to which Plaintiffs and the Class members are entitled.

86.    <u>Typicality</u>.  Fed. R. Civ. P. 23(a)(3).  Plaintiffs' claims are typical of the claims of the Class.  Plaintiffs and all Class members were exposed to uniform practices and sustained injury arising out of and caused by Defendant's unlawful conduct.

87.    <u>Adequacy of Representation</u>.  Fed. R. Civ. P. 23(a)(4).  Plaintiffs will

fairly and adequately represent and protect the interests of the members of the Class. Plaintiffs' Counsel are competent and experienced in litigating class actions.

88.     _Superiority of Class Action._  Fed. R. Civ. P. 23(b)(3).  A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all the members of the Class is impracticable. Furthermore, the adjudication of this controversy through a class action will avoid the possibility of inconsistent and potentially conflicting adjudication of the asserted claims.  There will be no difficulty in the management of this action as a class action.

89.     _Injunctive and Declaratory Relief._  Fed. R. Civ. P. 23(b)(2).  Defendant's misrepresentations are uniform as to all members of the Class.  Defendant has acted or refused to act on grounds that apply generally to the Class, so that final injunctive relief or declaratory relief is appropriate with respect to the Class as a whole.

## FIRST CAUSE OF ACTION

### Breach of Express Warranty

### (On Behalf of Plaintiffs And All Classes)

90.     Plaintiffs incorporate all preceding factual allegations as if fully set forth herein.

91.     Defendant sold the Products in its regular course of business.  Plaintiffs and Class members purchased the Products.

92.     Defendant made a promise and representation to Plaintiffs and Class members that the Products are "100% Natural."   Defendant's promises and representations constitute an express warranty that was provided to all consumers, and that became the basis of the bargain between Plaintiffs and Class members on the one hand, and Defendant on the other.   Defendant gave these express warranties to Plaintiffs and Class members in written form on the packaging of the Products.

93.     Defendant's written affirmations of fact, promises, and/or descriptions as alleged are each a written warranty.

94.     Defendant breached the warranty because the representation on the

Products' packaging that the Products are "100% Natural" is false, as the Products did not contain the properties represented by Defendant.

95.    The Products are not "100% Natural" because they contain artificial, synthetic ingredients sourced from GM crops, an artificial, highly-processed non-nutritive sweetener and/or the Contaminants that cause the Products to be not "100% Natural."

96.    All conditions precedent to seeking liability under this claim for breach of express warranty have been performed by Plaintiffs and Class members who paid for the Products at issue.

97.    On November 24, 2014, Plaintiff Burga provided notice to Defendant of its breaches of express warranty with respect to the Artificially-Sweetened Teas.

98.    On December 14, 2014, Plaintiff Conforti also provided notice to Defendant of its breaches of warranty with respect to the Artificially-Sweetened Teas.

99.    On January 23, 2015, Plaintiff Burga provided notice to Defendant of its breaches of express warranty with respect to the Genetically-Modified, Synthetic Teas and Contaminated Teas.

100.    In addition, Defendant has been on notice since at least November 6, 2013 that its "100% Natural" claim was false with respect to the Contaminated Teas.

101.    Thus, Defendant had actual and/or constructive notice that its "100% Natural" claims were and are false and to date has taken no action to remedy its breaches of express warranty.

102.    Defendant's breaches of warranty have caused Plaintiffs and Class members to suffer injuries, paying for falsely labeled products, and entering into transactions they would not have entered into for the consideration that Plaintiffs and Class members paid.  As a direct and proximate result of Defendant's breaches of warranty, Plaintiffs and Class members have suffered damages and continue to suffer damages, including economic damages in terms of the difference between the value of the Products as promised and the value of the Products as delivered.

103.   As a result of the breach of these warranties, Plaintiffs and Class members are entitled to legal and equitable relief including damages, costs, attorneys' fees, rescission, and/or other relief as deemed appropriate, for an amount to compensate them for not receiving the benefit of their bargain.

**SECOND CAUSE OF ACTION**

**Violation of Consumers Legal Remedies Act – Civil Code § 1750,** *et seq.*

**(On Behalf of Plaintiff Burga and the California Classes)**

104.   Plaintiff Burga incorporates all preceding factual allegations as if fully set forth herein.

105.   This cause of action is brought pursuant to the Consumers Legal Remedies Act, California Civil Code § 1750, *et seq.* (the "CLRA") because Defendant's actions and conduct described herein constitute transactions that have resulted in the sale or lease of goods or services to consumers.

106.   Plaintiff Burga and each member of the California Classes are consumers as defined by California Civil Code §1761(d).

107.   The Products are goods within the meaning of Civil Code §1761(a).

108.   Defendant violated the CLRA in at least the following respects:

a.   in violation of §1770(a)(2), Defendant misrepresented the source of the Products as "100% Natural," when they contained artificial, synthetic ingredients; ingredients sourced from GM crops, an artificial, highly-processed non-nutritive sweetener and/or the Contaminants;

b.   in violation of   §1770(a)(5), Defendant represented that the Products have characteristics, ingredients, and benefits (100% Natural) which they do not have (because they contain artificial, synthetic ingredients; ingredients sourced from GM crops, an artificial, highly-processed non-nutritive sweetener and/or the Contaminants that are not 100% natural);

c.   in violation of §1770(a)(7), Defendant represented that the Products are of a particular standard, quality or grade ("100% Natural") when they are

of another (containing artificial, synthetic ingredients; ingredients sourced from GM crops, an artificial, highly-processed non-nutritive sweetener and/or the Contaminants that are not 100% natural);

d.     in violation of §1770(a)(9), Defendant has advertised the Products (as "100% Natural") with intent not to sell them as advertised (containing artificial, synthetic ingredients; ingredients sourced from GM crops, an artificial, highly-processed non-nutritive sweetener and/or the Contaminants that are not 100% natural); and

e.     in violation of §1770(a)(16), Defendant represented that the Products have been supplied in accordance with previous representations (as "100% Natural"), when they were not (because they contained artificial, synthetic ingredients; ingredients sourced from GM crops, an artificial, highly-processed non-nutritive sweetener and/or the Contaminants that are not 100% natural).

109.   Defendant knew, or should have known, that its representations and advertisements were false and misleading.

110.   With respect to the Artificially-Sweetened Teas, Plaintiff Burga complied with Civil Code § 1782(a) by notifying Defendant in writing, by certified mail, of the violations with respect to the Artificially-Sweetened Teas alleged herein and demanded that Defendant remedy those violations.

111.   Defendant has failed to rectify or agree to rectify the problems associated with the Artificially-Sweetened Teas detailed above and give notice to all affected consumers within 30 days of the date of written notice pursuant to California Civil Code § 1782.   Plaintiff Burga thus add claims for actual, punitive, and statutory damages pursuant to the CLRA.   Plaintiff Burga and the California Classes also seek a Court order enjoining the above-described wrongful acts and practices of Defendant and for restitution, disgorgement, statutory damages, and any other relief that the Court deems proper.

112.   With respect to the Genetically-Modified, Synthetic Teas and

Contaminated Teas, on January 23, 2015, Plaintiff Burga notified Defendant in writing, by certified mail, of the violations alleged herein and demanded that Defendant remedy those violations.

113.   If Defendant fails to remedy the violations alleged herein within 30 days of receipt of Plaintiff's notice, Plaintiff Burga will amend this Complaint to add claims for actual, punitive, and statutory damages pursuant to the CLRA with respect to the Genetically-Modified, Synthetic Teas and Contaminated Teas.

114.   Defendant's conduct is malicious, fraudulent, and wanton in that Defendant intentionally and knowingly provided misleading information to the public

### THIRD CAUSE OF ACTION

**California False Advertising Law – Cal. Bus. & Prof. Code § 17500, *et seq*.**

**(On Behalf of Plaintiff Burga and the California Classes)**

115.   Plaintiff Burga incorporates all preceding factual allegations as if fully set forth herein.

116.   Defendant publicly disseminated untrue or misleading advertising or intended not to sell the Products as advertised in violation of California's False Advertising Law ("FAL"), Business & Professional Code § 17500, *et seq.*, by representing that the Products are "100% Natural," when they are not.

117.   Defendant committed such violations of the False Advertising Law with actual knowledge or in the exercise of reasonable care should have known was untrue or misleading.

118.   Plaintiff Burga reasonably relied on Defendant's representations and/or omissions made in violation of California Business & Professional Code § 17500, *et seq*.

119.   As a direct and proximate result of Defendant's violations, Plaintiff Burga suffered injury in fact and lost money.

120.   Plaintiff Burga, on behalf of herself and the California Classes, seek:  (a) injunctive relief in the form of an order requiring Defendant to cease the acts of unfair

competition alleged herein and to correct its advertising, promotion and marketing campaigns; (b) full restitution of all monies paid by Plaintiffs and all Class members because of Defendant's deceptive practices including, but not limited to, disgorgement of all profits derived from the sale of the Products; (c) interest at the highest rate allowable by law; and (d) the payment of Plaintiffs' attorneys' fees and costs pursuant to, *inter alia*, California Code of Civil Procedure Section 1021.5.

## FOURTH CAUSE OF ACTION

### California Unfair Competition Law – Cal. Bus. & Prof. Code § 17200, *et seq.*

### (On Behalf of Plaintiff Burga and the California Classes)

121.   Plaintiff Burga incorporates all preceding factual allegations as if fully set forth herein.

122.   Defendant engaged in unlawful, unfair, and/or fraudulent conduct under California's Unfair Competition Law ("UCL"), California Business & Professions Code § 17200, *et seq.*, by representing that the Products are "100% Natural," when they are not.

123.   Defendant's conduct is unlawful in that it violates the Consumers Legal Remedies Act, California Civil Code §§ 1750, *et seq.*, California's False Advertising Law, California Business & Professions Code §§ 17500 *et seq.*, California's Sherman Food, Drug, and Cosmetic Act, Cal. Health & Safety Code §§ 109875 *et seq.*, and federal law including 21 U.S.C. § 346a and 40 C.F.R. §§ 180 *et seq.*

124.   Defendant's conduct is unfair in that it offends established public policy and/or is immoral, unethical, oppressive, unscrupulous, and/or substantially injurious to Plaintiffs and Class members.  The harm to Plaintiff Burga and Class members arising from Defendant's conduct outweighs any legitimate benefit Defendant derived from the conduct.  Defendant's conduct undermines and violates the stated spirit and policies underlying the Consumers Legal Remedies Act, the False Advertising Law, and federal laws and regulations as alleged herein.

125.   Defendant's   actions   and   practices   constitute   "fraudulent"   business

---

CLASS ACTION COMPLAINT

practices in violation of the UCL because, among other things, they are likely to deceive reasonable consumers.  Plaintiff Burga relied on Defendant's representations and omissions.

126.   As a direct and proximate result of Defendant's violations, Plaintiff Burga suffered injury in fact and lost money because they purchased the Products at the price they paid believing them to be 100% natural when they were not.

127.   Plaintiff Burga, on behalf of herself and the California Classes, seek:  (a) injunctive relief in the form of an order requiring Defendant to cease the acts of unfair competition alleged herein and to correct its advertising, promotion, and marketing campaigns; (b) full restitution of all monies paid by Plaintiff and all Class members because of Defendant's deceptive practices including, but not limited to, disgorgement of all profits derived from the sale of the Products; (c) interest at the highest rate allowable by law; and (d) the payment of Plaintiff's attorneys' fees and costs pursuant to, *inter alia*, California Code of Civil Procedure Section 1021.5.

## FIFTH CAUSE OF ACTION

**Violation of New York General Business Law § 349 (Deceptive Acts and Practices)**

**(On Behalf of Plaintiff Conforti and the New York Classes)**

128.   Plaintiff Conforti incorporates all preceding factual allegations as if fully set forth herein.

129.   New York General Business Law § 349 ("GBL § 349") prohibits "deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in [New York]."

130.   As fully alleged above, throughout the Class Period, by advertising, marketing, distributing, and/or selling the Products with claims that they were "100% natural" to Plaintiff Conforti and other Class members, Defendant engaged in, and continue to engage in, deceptive acts and practices because the Products contain Contaminants and/or Reb A that are not natural.

131.   Plaintiff Conforti and other Class members seek to enjoin such unlawful,

deceptive acts and practices as described above. Each of the Class members will be irreparably harmed unless the unlawful, deceptive actions of Defendant are enjoined in that Defendant will continue to falsely and misleadingly advertise the "100% Natural" nature of the Products.

132.   Plaintiff Conforti believed Defendant's representations that the Products she purchased were "100% natural." Plaintiff Conforti would not have purchased the Products had she known the Products were not "100% Natural" because they contained artificial, synthetic ingredients sourced from GM crops, an artificial, highly-processed non-nutritive sweetener and/or the Contaminants that are not all natural.

133.   Plaintiff Conforti was injured in fact and lost money as a result of Defendant's conduct of improperly describing the Products as "100% Natural." Plaintiff Conforti paid for "100% Natural" products, but did not receive such products. The products Plaintiff Conforti and Class members received were worth less than the products for which they paid.

134.   Plaintiff Conforti and Class members seek declaratory relief, restitution for monies wrongfully obtained, disgorgement of ill-gotten revenues and/or profits, injunctive relief, enjoining Defendant from continuing to disseminate their false and misleading statements, and other relief allowable under GBL § 349. Plaintiff Conforti and Class members also request an order requiring Defendant to perform a corrective advertising campaign.

## SIXTH CAUSE OF ACTION

### Violation of New York General Business Law § 350 (False Advertising)
### (On Behalf of Plaintiff Conforti and the New York Classes)

135.   Plaintiff Conforti incorporates all preceding factual allegations as if fully set forth herein.

136.   New York General Business Law § 350 ("GBL § 350") makes "[f]alse advertising in the conduct of any business, trade or commerce or in the furnishing of any service" in New York unlawful. GBL § 350 defines "false advertising," in relevant

part, as "advertising, including labeling, of a commodity . . . if such advertising is misleading in a material respect."

137.   Throughout the Class Period, by advertising, marketing, distributing, and/or selling the Products with claims that they were "100% Natural" to Plaintiff Conforti and other Class members, Defendant violated GBL § 350 by engaging in, and they continue to violate GBL § 350 by continuing to engage in, false advertising concerning the composition of the Products that contain they contained artificial, synthetic ingredients sourced from GM crops, an artificial, highly-processed non-nutritive sweetener and/or the Contaminants, which are not natural.

138.   Plaintiff Conforti and other Class members seek to enjoin such unlawful acts and practices as described above. Each of the Class members will be irreparably harmed unless the unlawful actions of Defendant are enjoined in that Plaintiff Conforti will continue to be unable to rely on Defendant's representations that the Products are "100% Natural."

139.   Plaintiff Conforti believed Defendant's representations that the Products were "100% Natural." Plaintiff Conforti relied on Defendant's representations and would not have purchased the Products had she known the Products contained artificial, synthetic ingredients sourced from GM crops, an artificial, highly-processed non-nutritive sweetener and/or the Contaminants that are not all natural.

140.   Plaintiff Conforti was injured in fact and lost money as a result of Defendant's conduct of improperly describing the Products as "100% Natural." Plaintiff Conforti paid for "100% Natural" products, but did not receive such products. The Products Plaintiff Conforti received were worth less than the Products for which she paid.

141.   Plaintiff Conforti and Class members seek declaratory relief, restitution for monies wrongfully obtained, disgorgement of ill-gotten revenues and/or profits, injunctive relief, enjoining Defendant from continuing to disseminate its false and misleading statements, and other relief allowable under New York General Business

Law § 350. Plaintiff Conforti and Class members also request an order requiring Defendant to perform a corrective advertising campaign.

## SEVENTH CAUSE OF ACTION

### Violation of State Consumer Fraud Acts

### (On Behalf of the Multistate Classes)

142. Plaintiffs incorporate all preceding factual allegations as if fully set forth herein.

143. The Consumer Fraud Acts of the States in the Multi-State Class prohibit the use of unfair or deceptive business practices in the conduct of trade or commerce.

144. Defendant intended that Plaintiffs and each of the other members of the Multi-State Class would rely upon their deceptive conduct, and a reasonable person would in fact be misled by this deceptive conduct.

145. As a result of the Defendant's use or employment of unfair or deceptive acts or business practices, Plaintiffs and each of the other members of the Multi-State Class have sustained damages in an amount to be proven at trial.

146. In addition, Defendant's conduct showed malice, motive, and the reckless disregard of the truth such that an award of punitive damages is appropriate.

## JURY DEMAND

Plaintiffs demand a trial by jury of all claims in this Complaint so triable.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the other members of the Classes proposed in this Complaint, respectfully requests that the Court enter judgment in her favor and against Defendant, as follows:

A. Declaring that this action is a proper class action, certifying the Classes as requested herein, designating Plaintiffs as Class Representatives and appointing the undersigned counsel as Class Counsel;

B. Awarding injunctive relief as permitted by law or equity, including enjoining Defendant from continuing the unlawful practices as set forth herein, and

ordering Defendant to engage in a corrective advertising campaign;

C.     For an accounting by Defendant for any and all profits derived by Defendant from their herein-alleged unlawful, unfair and/or fraudulent conduct and/or business practices;

D.     Ordering Defendant to pay actual damages (and no less than the statutory minimum damages), restitution, and disgorgement of all money or property wrongfully obtained by Defendant by means of their herein-alleged unlawful, unfair, and fraudulent business practices, and equitable monetary relief to Plaintiffs and the other members of the Class;

E.     Recovery of the amounts by which Defendant has been unjustly enriched;

F.     Ordering Defendant to pay punitive damages, as allowable by law, to Plaintiff and the other members of the Class;

G.     Ordering Defendant to pay statutory damages, as allowable by the statutes asserted herein, to Plaintiffs and the other members of the Class;

H.     Ordering Defendant to pay attorneys' fees and litigation costs to Plaintiff and the other members of the Classes pursuant to California Code of Civil Procedure Section 1021.5 and the common law private attorney general doctrine;

//
//
//
//
//
//
//
//
//
//
//

1    I.      Ordering Defendant to pay both pre- and post-judgment interest on any

2  amounts awarded; and

3    J.      Ordering such other and further relief as may be just and proper.

4  DATED:  January 26, 2015                    Respectfully submitted,

5                                              **AHDOOT & WOLFSON, PC**

6                                              By:  /s/ Tina Wolfson

7                                              Tina Wolfson
                                               Robert Ahdoot
                                               Keith Custis
8                                              Theodore W. Maya

9                                              1016 Palm Avenue
                                               West Hollywood, California 90069
10                                             Tel: 310-474-9111
                                               Fax: 310-474-8585
11

12                                             Christopher P. Ridout
                                               Caleb Marker
13                                             **RIDOUT LYON + OTTOSON, LLP**
                                               555 E. Ocean Boulevard, Suite 500
14                                             Long Beach, California  90802
                                               (562) 216-7380
15                                             (562) 216-7385 Facsimile

16                                             *Counsel for Plaintiff Sandra Burga*

17                                             Todd S. Garber, *Pro Hac Vice*
                                               *Forthcoming*
18                                             **FINKELSTEIN, BLANKINSHIP,**
                                               **FREI-PEARSON & GARBER, LLP**
19                                             1311 Mamaroneck Avenue
                                               White Plains, New York 10605
20                                             (914) 517-5023
                                               (914) 517-5055 Facsimile

21                                             *Counsel for Plaintiff Alison Conforti*

22

23

24

25

26

27

28

---

### AFFIDAVIT OF TINA WOLFSON

I, Tina Wolfson, declare as follows:

1.      I am an attorney with the law firm of Ahdoot & Wolfson, P.C.  I am admitted to practice law in California and before this Court, and am a member in good standing of the State Bar of California.  This declaration is made pursuant to California Civil Code Section 1780(d).  I make this declaration based on my research of public records and upon personal knowledge and, if called upon to do so, could and would testify competently thereto.

2.      Based on my research and personal knowledge, Defendant The Hain Celestial Group, Inc. ("Defendant") does business within the State of California, and Plaintiff Burga purchased Defendant's product within the State of California, as alleged in the Class Action Complaint.

I declare under penalty of perjury under the laws of the United States and the State of California this 26th day of January 2015 in Los Angeles, California that the foregoing is true and correct.

_____
Tina Wolfson